**GERALDINE JAMES, Plaintiff**

**v.**

**JOHN ROBERTS, Defendant**

# Civil No. 1117/1978
# Territorial Court of the Virgin Islands

Div. of St. Croix at Christiansted

# May 15, 1979

273

274

────────────

G. Luz A. James, Esq., Christiansted, St. Croix, *for plaintiff*

John B. Nichols, Esq., Christiansted, St. Croix, *for defendant*

SILVERLIGHT, *Judge*

### MEMORANDUM OPINION AND JUDGMENT

The enforcement of a restrictive covenant in a deed to real property constitutes the basis of this action. The covenant will be enforced by the issuance of an appropriate injunctive order.

Raymond and Ada Scheel owned a large tract of land known as Parcel 6-A, Peter's Rest, St. Croix, which they laid out as a subdivision consisting of 83 lots. All their deeds of conveyance to purchasers contained the following provision:

6. It is understood and agreed that the premises are in a limited commercial area and may be used for purposes not inconsistent with an adjoining residential area. . . . No slaughterhouse, burial plot, kennel, stable, piggery, goat pen, or place where cattle are kept, nor other animals or fowl, except the normal number of dogs and cats usually found in a household, may be allowed on the premises.

This suit is brought by the owner of Plot 161 in said subdivision against the owner of Plot 159. The two lots, separated by Plot 160, front upon the same road. Both parties

are grantees of the Scheels, and their respective properties are part of Parcel 6-A, Peter's Rest, St. Croix, as subdivided. Defendant conducts a wholesale egg business, but in the past he has also slaughtered chickens commercially. He admits that in 1968 he purchased Plot 159, consisting of approximately one-half acre, constructed a dwelling thereon, and began his business by building a chicken house and stocking it with 300 chickens. Between 1969 and November 1978, the number of chickens on the property reached its maximum of 2500. From June 1978 to January 1979, he conducted a slaughtering business on Plot 159, but has since terminated all slaughtering operations. Presently, in addition to the dwelling house, there are three chicken houses, 400 chickens, 87 goats and 9 head of cattle situated on this .342-acre plot.

The defendant's violation of the restrictive covenant is undenied, and his defenses are those commonly raised in restrictive covenant suits: changes in neighborhood, waiver by acquiescence, relative hardship and laches.

### I—CHANGES IN NEIGHBORHOOD

Restrictive covenants will be held nonenforceable where the neighborhood has changed to such an extent that that the original purpose behind the restriction can no longer be served. Beatty v. Clark, 11 V.I. 366 (D.V.I. 1975).

A change in conditions which will defeat a restrictive covenant must be "so great or so fundamental or radical as clearly to neutralize the benefits of the restriction to the point of defeating the purpose of the covenant." 20 AmJur.2d, Covenants, Conditions, and Restrictions, § 282. Decisions reached in the Virgin Islands show a strong disinclination to find such a change. Beatty, supra; Francis v. Rios, 350 F.Supp. 1130 (D.V.I. 1972); Neal v. Grapetree Bay Hotels, Inc., 8 V.I. 267 (D.V.I. 1971).

276

The restrictive covenant in the instant case was clearly imposed to prevent offensive sights, sounds and odors which are likely to result from the keeping of fowl and animals for commercial purposes.

Substantial violations have occurred on Plot 160, owned by defendant's mother and on which she and another son, Clevon Roberts, reside. Clevon was in the chicken business on Plot 160 for a nine-month period in 1974, at which time he owned approximately 800 chickens. Mrs. Roberts has also raised chickens there; in 1974, she had 300 chickens which she bought from Clevon when he discontinued his business, and she presently maintains at least 12 chickens.

■■ Defendant has named only four alleged violators in addition to himself and his mother. The Court cannot consider the alleged violations of Mr. Reid, Mr. Perez, and Mr. Milligan which, according to defendant, began in 1969, 1970 and 1971, respectively, since they were in existence prior to the time plaintiff acquired title to Plot 161. "In order to utilize the argument of a change in the character of the neighborhood, those changes must have occurred subsequent to the time Plaintiff purchased [her] land." Beatty, supra, at 376. The existence of violations on 7 out of 83 lots[1] is not "so great . . . so fundamental or radical as . . ." to constitute a change of condition which depletes the restriction of its value.

## II—WAIVER BY ACQUIESCENCE

Defendant asserts that plaintiff has waived her right to enforce the covenant against him by permitting other grantees to violate the same covenant.

■ The general rule of law is:

---

[1] Violations have been alleged to exist on Plot No. 159, owned by defendant; Plot No. 160, owned by defendant's mother; Plot No. 166, owned by Mr. Rivera; Plot No. 169, owned by Mr. Perez; Plots No. 170 and 171, owned by Mr. Milligan; and Plot No. 184, owned by Mr. Reid.

Acquiescence by one person in a violation by another of an obligation arising out of a promise respecting the use of land disables the one so acquiescing from enforcing by injunction an obligation of like effect against a third person *when the acquiescence has the effect of preventing the realization of the benefit sought to be gained by the performance of the obligation attempted to be enforced.* Restatement of Property § 561. (Emphasis added.)

■ Mere acquiescence to the breach of a restriction is not in and of itself enough to constitute an abandonment if the restriction remains of value. Francis v. Rios, supra. For purposes of the acquiescence doctrine, whether a restriction remains of value is determined by the character and materiality of the breach or breaches that have been allowed.

■ The first factor to be considered is the extent to which breaches have been permitted.[2] Here, there is no evidence of widespread violations.

■■ The next consideration is the kind of breaches previously permitted.[3] Since defendant's testimony that violations are occurring on six other plots was only corroborated as to four of the plots, it would seem that if the remaining two violations exist at all, they are relatively inconspicuous and not of the magnitude of that with which defendant is charged. A tolerated, minor breach need not bar a wider and more serious one. Stated another way,

Plaintiffs are not estopped from preventing a most flagrant violation of the restrictions on account of their theretofore failure to stop a slight deviation from the strict letter of the restrictions. Boston-Edison Protective Association v. Goodlove, 248 Mich. 625, 227 N.W. 772, 773, quoted in Francis v. Rios, supra.

■ It may also be noted that there are at least two classes of restrictive covenants, those concerning construction of buildings or other permanent improvements upon

---

[2] Beatty, supra.
[3] See fn. 2.

the restricted property, and those concerning the use of the property. Although the doctrine of acquiescence is applicable to both classes of covenants, it is more readily applied to the first, since breaches of that kind result in permanent changes which cannot easily be corrected. When an injured lot owner allows another lot owner to construct valuable improvements in violation of the restrictive covenant, he cannot enjoin subsequent violators if he is prevented from securing the benefits gained by enforcement of those covenants because the conditions have become permanently changed. But where, as in this case, the past breaches related to *use* of the property and no substantial physical changes have occurred, waiver of the right to enjoin other and more substantial breaches results less frequently. Ocean City Ass'n v. Chalfant, 55 A. 801 (N.J. 1903).

 The last relevant factor in determining acquiescence is the physical proximity of the breaches to the complainant's property.[4]

 Since the acquiescence doctrine rests upon the premise that in many instances no benefit will be derived by enjoining one person while permitting a similar violation of the covenant by another, the acquiescence which defeats enforcement of the restriction must exist when relief is sought. Restatement of Property § 561, Comment c. Violations have occurred and continue to occur on defendant's mother's property which is located between that of defendant and that of plaintiff.

 The violation we must be concerned with, if it is to constitute a bar to the relief sought, is the present violation consisting of the keeping of a dozen chickens. This violation, though closer in proximity to plaintiff's land than defendant's violation, is minor and does not support a finding of acquiescence.

---

[4] See fn. 2.

It cannot be said that the violations previously allowed are of such character as to divest the covenant of all value.

### III—RELATIVE HARDSHIP

Defendant asserts by way of defense that plaintiff did not prove that the odor which is interfering with the enjoyment of her property was caused by the operation of defendant's farm. This defense is without merit. The Beatty court held that inasmuch as the enforcement of a restrictive covenant is a contractual right, a complainant need not show that he was harmed by the violation unless defendant raises the relative hardship doctrine. Restatement of Property § 563. The court held that, before granting injunctive relief under the relative hardship doctrine, plaintiff must show irreparable injury *only* if defendant has shown that his hardship under an injunction would be substantial. The continuing emanation of noxious odors from defendant's farm operation, depriving plaintiff of the peaceful and undisturbed residential use of her property, constitutes a substantial hardship to her.

In an effort to show that *his* hardship would be substantial, defendant claims he will have to sell his chickens live if an injunction is granted. This, he says, would result in a serious financial loss, since these chickens are presently at their full egg production period and will continue to be for approximately 15 more months. He also claims that he would lose his property since 75% of his income is derived from his chickens.

These claims are not supported by the facts. Simple mathematics discloses that defendant does not derive 75% of his income from the chickens. Each week he works three nights at the Buccaneer Hotel and four nights at the Smithfield Mill Restaurant. The combined weekly income from these two jobs ranges from $175 to $200, depending upon tips. In 1978, he made $10,000 from the operation of

the chicken farm. Thus, based on the 1978 figures, the percentage of his income derived from the chickens is closer to 50% of the total than 75%.[5]

██ Applying the high standard of proof implicit in *Beatty*, I conclude that granting an injunction would not result in undue injury to defendant. Defendant continued the operation of his business after he knew of the efforts to stop his violations. It is clear that he ". . . chose to gamble on either the passivity of the neighborhood residents, or his luck with the law . . . [and] cannot now come into court and plead a loss on [his] investment."[6]

### IV—LACHES

Plaintiff was first shown the property in June 1970. Shortly thereafter, she signed a land purchase contract, and in June 1973, she accepted a deed to the property. Sometime in 1975, Douglas Canton, as her agent, commenced construction of a house thereon, occupying the same as her tenant since November 1977. On several occasions, plaintiff and Mr. Canton complained of the odor to various governmental agencies, as a result of which the Department of Health's Division of Sanitation has been making inspections of the premises since April 3, 1978, until the date of trial. In 1978, Criminal Case No. 68/1978, alleging that defendant's use of his property constituted a nuisance, was filed; defendant was found not guilty. In June 1978, the Government filed Civil Case No. 1424/1978, alleging defendant was in violation of the zoning laws. A violation was found and defendant was enjoined from engaging in chicken farming on his property. On June 26, 1978, plaintiff filed the instant action.

---

[5] No testimony was elicited concerning income from the cattle or goats which defendant raises. Whatever income is derived from this source, however small, has not been used in this computation.

[6] For support of this conclusion, see the factual background set forth under IV—Laches. See also fn. 2 at 386.

■ Although plaintiff is chargeable with knowledge of the violation since 1975, when Mr. Canton entered the premises to construct a house, laches requires inexcusable delay by the plaintiff in bringing suit which results in prejudice to the defendant. Holmes v. Government, 10 V.I. 365 (D.V.I. 1974).

■ The doctrine was applied by the Third Circuit in Turner v. American Dredging Company, 407 F.Supp. 1047, 1052 (E.D. Pa. 1976), wherein the court held:

In this circuit a court applying the equitable doctrine of laches to a particular factual configuration must engage in a two-step analysis. First, the court must identify the party bearing the burden of proof, and then test this party's evidentiary showing on the nature of the delay involved and the amount of prejudice suffered against the burden.

In Churma v. United States Steel Corporation, 514 F.2d 589, 593 (C.A.3d 1975), the Court allocated the burden of proof in relation to the laches defense:

Before Gruca [v. United States Steel Corp., 495 F.2d 1252 (3d Cir. 1974)], the Third Circuit rule concerning burden of proof as to laches was that enunciated in Burke v. Gateway Clipper, Inc., 441 F.2d 946 (3d Cir. 1971), which was relied upon by the district court in this case. Burke recognized that other circuits required the defendant to prove laches as an affirmative defense, but reaffirmed that in this circuit the plaintiff had to "come forward and prove that his delay was excusable and that it did not unduly prejudice the defendant." 441 F.2d at 949. Gruca, while consistent with Burke, made clear that the allocation of the burden depends on whether the statute of limitations has run. Prior to the running of the statute, the defendant has to prove laches, but thereafter the plaintiff has to disprove laches. 495 F.2d at 1295 and n.8.

The relevant statute of limitations in the instant case is six years, applied to actions upon contracts, 5 V.I.C. 31(3). Since plaintiff filed suit within the permitted time, the burden of proof falls on defendant, who has failed to prove any prejudice resulting to him and the laches defense fails.

282

## V—DAMAGES

Plaintiff's claim for damages must be denied. "[T]o recover compensatory damages, the fact of damage as well as the amount of damage must be proven with reasonable certainty. The trier of fact is not at liberty to speculate but must be able to find some basis in the evidence for fixing the award." (Citations omitted.) St. Thomas House v. Barrows, 15 V.I. 435 (D.V.I. 1978). The record is devoid of any evidence establishing the amount of damages with sufficient certainty to support recovery. This, coupled with the fact that the court concludes that the injunction which shall issue will be adequate relief, causes plaintiff's claim for damages to be denied. Furthermore, for the foregoing reasons, defendant's counterclaim is dismissed.

### JUDGMENT

In accordance with the Memorandum Opinion entered on even date herewith, it is

ORDERED, ADJUDGED AND DECREED that the defendant, John Roberts, his agents, servants and employees, and all persons acting upon his direction or upon his behalf, be and they hereby are enjoined from conducting, operating, maintaining or otherwise directly or indirectly engaging in the business of egg production or chicken farming on premises known and designated as Plot No. 159, Estate Peter's Rest, Christiansted, St. Croix; and it is further

ORDERED, ADJUDGED AND DECREED that plaintiff's claim for compensatory damage be and same hereby is denied; and it is further

ORDERED, ADJUDGED AND DECREED that defendant's counterclaim be and the same hereby is dismissed; and it is further

ORDERED, ADJUDGED AND DECREED that costs and counsel fees shall be awarded to plaintiff upon the submission of an appropriate affidavit within 20 days from the date of entry of this judgment in accordance with the Estien v. Christian standards.